On Rehearing.
MONROE, J.
After the rehearing had been granted in this case, the omissions in the transcript, which are referred to in the original opinion, were corrected by means of an order, in the nature of a writ of certiorari, and the return thereto, from which latter, it appears that the minutes, as originally written, show that the court was properly organized and opened, the grand jury impaneled, the foreman appointed and sworn, the indictment duly returned, and all the other proceedings leading to the conviction and sentence of the defendant regularly conducted. Counsel for defendant object to what they term “the correction of the minutes,” on the ground that the defendant was not present when the supposed correction was made. But the minutes were not corrected, and there was no more reason for the presence of the defendant when the clerk returned the copy of minutes which he had failed to transcribe than when he returned the original transcript. The state, as appelleein a criminal prosecution, is not responsible for defects in the transcript of appeal, and,, though this court may not be willing to confirm a conviction unless it appears to have been legally obtained, it is unwilling to set aside a valid conviction merely because, by the negligence of the clerk of the trial court,, such transcript has been imperfectly prepared, hence, it is well settled that the writ of certiorari may be used as an auxiliary-process to obtain a perfect transcript. Knoblock’s Crim. Dig. p. 93.
On the merits, the record shows that during the trial, counsel for the defendant reserved certain bills’ of exception which the judge refused to sign, and that counsel excepted to such refusal and obtained the signature of the judge to a bill in which the-other bills were incorporated, by reference,, and in which the judge gives, as his reason» for refusing to sign such other bills, that a long established rule of his court requires-that “all bills of exception shall be submitted to the opposing counsel and to the court for-examination and signature not later than the-following day after they are reserved, unless, the court shall grant further time, to be-shown by entry on the minute book,” that the bills in question were reserved on the 4th and 5th days of December, 1905, and were-not so presented for examination and signature until the 9th of that month, and' that no extension of time was applied for, or granted. The judge further states that the *612 establishment of the rule was within his authority, since the same is not in conflict with law, and is neither oppressive nor unreasonable. We are of opinion that this statement is conclusive. The district judges are authorized to establish rules of practice in their courts where the law is silent. State v. Gardner, 10 La. Ann. 26. We are aware of no law which prescribes the time within which bills shall be presented for signature, and we agree with our learned broth•er that the rule established by him is well ■calculated to promote an orderly administration of justice and that it denies to the defendant in a criminal prosecution no right to which he is entitled. Beyond this, it has "been held that the remedy, where the judge ¡•refuses to sign a bill of exceptions, properly taken, is by appeal. State v. Gunter, 30 La. Ann. 536. Counsel moved for a new trial ¡upon certain grounds which will now be 'Considered, to wit:
That the District Attorney, in his closing -argument, advanced the theory that a knife, which was found under the body of the deceased, had been pulled out of his pocket in an attempt made by him to get out a handkerchief; whereas, the accused alone testified to the drawing of a knife, and stated that it had been drawn from a pocket on the left side, In front, which we understand to mean that it was drawn from a pocket other than that containing the handkerchief. It ■appears, however, from the statement of the .judge that the accused testified that when the deceased was killed by a blow with a piece of scantling he was advancing on the accused with an open knife, with a bright blade; whereas the knife to which the district attorney referred was closed and rusty; from which circumstances and from the further fact, stated by him, that “there was abundant evidence to show that the deceased was in the act of drawing a handkerchief when the fatal blow was struck,” the learned judge concluded that it was competent for the district attorney to present to the jury the argument complained of, as predicated upon the evidence. There can be no doubt of the correctness of this ruling. It was competent for the district attorney, as it was competent for counsel for defendant, to draw his own conclusion from the evidence adduced, and it was the province of the jury to determine which conclusion was correct.
It was urged that one Di Carlo, by whom the testimony of certain Italian witnesses was interpreted, did not give the language of the witnesses, but attempted to give the meaning, though he admitted that he did not understand all that the witness said, and that this failure to give the exact language, as nearly as it could be rendered in English, restricted the cross-examination, and was prejudicial to the accused, in that it failed to give to the jury a correct impression of the testimony, as a whole, and of the credibility of the witnesses. This complaint is based almost entirely upon an ex parte affidavit (which was filed in connection with the motion for new trial) of one James Miller, who stated that he heard the Italians testify; that he had a fair knowledge of the Italian language ; that the interpreter failed to give the true interpretation of the testimony, and afterwards stated to affiant that he did not understand the witnesses fully. Counsel for defendant say in their brief that Miller was a traveling man, and that he informed them that he would be willing to testify on the hearing of the motion for new trial, if he should be in town; but that he might be called away at any moment. As a matter of fact, he did not testify, and there is nothing in the record to show that any effort was made to obtain his testimony. On the other hand, it appears that Di Carlo resides in Lake Charles, where he has the respect of the community; that he is an educated man, who *614 ■speaks good Italian, as, also, what he calls “rough” Italian; that he was born and reared until he reached the age of 23, in Sicily, within a few miles of where the witnesses had lived ; that he understood their dialect because it was his vernacular; and that he understood English quite well, from having lived in this country for 19 years. Being examined as a witness, on the hearing of the motion for new trial, he denied that he had told Miller that he did not understand the testimony which had been given, and stated that he had interpreted faithfully and literally, so far as he could, save that at times the witnesses repeated answers or statements which he gave but once. It is admitted that Di Carlo was accepted by and interpreted without objection from defendant throughout the trial, and no specific charge of misinterpretation or failure to interpret is brought against him; in fact, no charge of any kind save the vague one contained in the ex parte affidavit of Miller, which, as we have seen, is wholly unsubstantiated. Under the circumstances we agree with the judge a quo that this complaint is without foundation.
The learned counsel further urged that the interpreter was not legally appointed, and that the court was not legally organized, by reason of the fact that during a large portion of the trial, one Eugene J. Leveque acted .as minute clerk, though his appointment to that position had not been approved by the judge.
On the subject of the .appointment of Di Carlo, as interpreter, the judge who was ■called as a witness on the hearing of the motion for new trial, testified, in part, as follows:
“Q. He was appointed interpreter? A. Xes, sir; there was no special appointment. I thought it was an agreement, between him and the district attorney, that he was to act as interpreter, and Frank Eilizoli was to act as interpreter for the defense, and when Mr. Di Carlo was sworn, I asked where was Mr. Filizoli, as it was my understanding that he, too, was to act as interpreter; in other words * * * in cases where I do not understand the language, I always like to have two interpreters, one by the state and one by the defendant, so that both may be satisfied.”
Di Carlo, in addition to the testimony already given, stated that he had been sworn, and that the lawyers had said that he was acceptable to them, and, at that point in his examination, we find the following, to wit:
“Attorney for defense, at this point, states that the state asked him if Frank Filizoli would be satisfactory to him, to act as interpreter in this matter. Attorney for defense, not wishing to have his acts in any manner impeached, said that he had paid Eilizoli for information in this matter, and would, therefore, leave the state to decide whether Frank Filizoli should act as interpreter, and that, after examination, Di Carlo was accepted.”
As to Leveque, who is said to have acted as minute clerk, he testified that he had held a commission as deputy clerk for about two years; that he had on several occasions acted as minute clerk, though his appointment to that position had never been approved by the judge; and that no objection had been made to his so acting. Whether he acted in that capacity during the trial of the instant ease does not appear, save by inference, and there is nothing to indicate what particular function he discharged if he did so act. From any point of view the objection to the appointment of the interpreter and to the organization of the court came too late. State v. Baudoin, 115 La. 773, 40 South. 42.
Another ground stated in the motion for new trial is that the district attorney, in his closing' argument, • said, in substance, that crime was rife in the parish, and was increasing, and that it was the duty of the jury to help stop it, and that he depended on them to render a verdict accordingly, and that the parish of Calcasieu needed a conviction in that cause. The statement, per curiam (in the bill of exceptions to the overruling of the motion), is as follows:
“The district attorney made use of no such language either in substance or in form as that quoted.”
*616 Still another ground, as set forth in the motion, is that the district attorney, in commenting on the witnesses for the defense, after dwelling for some time on the unreliability of the three negro witnesses for the defense, began his remarks on the testimony of the two white witnesses with the following appeal to the prejudice of the jury:
“You must believe the testimony of these two white boys, two American citizens,” that “the papers of the city and parish have been filled for the last two weeks with a series of murders and shooting affairs”; and that “these were undoubtedly known to the jury.”
And a plea of this kind coming from the district attorney was prejudicial to the accused and apt to cause the jury to overlook the doubt of his guilt in their minds. The statement of the judge, contained in the bill, as to this matter, is as follows:
“As to the language of the district attorney, quoted in paragraph 5 in the motion for new trial, I wish to say that the same is correctly quoted, but it is a detached statement, only, of what he said. Prior to this, he had explained to the jury that they were the sole judges of the credibility of each of the witnesses, that nothing said, either by him or by counsel, should have any weight on that point. When the district attorney made use of that language and the attorney for the defense objected, the court instructed the jury that they should disregard anything said by counsel which was outside the record, and that they should be governed, solely, by the law and the evidence. And the court, in its charge to the jury, instructed them that the law presumed the accused innocent until proven guilty, beyond a reasonable doubt, and that the jurors were the sole judges of the law and the evidence, the sole judges of the credibility of all the witnesses, and of the weight to be attached or given to the. testimony of each witness. And the court is of opinion that the accused has had a fair and impartial trial and that the verdict is fully sustained by the facts and evidence before the jury and that he has not been wronged or his case been prejudiced in the least. The two white witnesses referred to by the district attorney in his comment upon the evidence, were witnesses put on the stand by the defendant, and the court fails to see how the accused could be prejudiced by the comment of the district attorney upon the testimony of the accused’s witnesses, when their testimony is in nowise discredited, and where there is not even an effort made to discredit them, as was the case here.”
It appears that among the witnesses were Italians, American citizens, who were white, and American citizens, who were negroes, and we infer from the remark of the district attorney that his purpose was merely to distinguish between them, as he might have done by using their names, and, more particularly, to distinguish between witnesses who had been called on behalf of the defendant, and this without intending to appeal to prejudice based on race or nationality, since the Italian witnesses who had been called on behalf of the state were evidently not regarded as American citizens, and it is hardly to be supposed that the district attorney was attempting to prejudice the jury against witnesses whom he himself had called.
Judgment affirmed.